ADELE OLGA RICKARD, Appellant *v.* CITY OF RENO, a Municipal Corporation, and LERNER SHOPS OF NEVADA, INC. and WILLIAM E. LYNCH, NELLIE J. LYNCH, DONALD V. LYNCH dba LYNCH'S BAZAAR, Respondents.

No. 3859

September 30, 1955.                     288 P.2d 209.

(Rehearing denied November 18, 1955.)

*Nada Novakovich,* of Reno, for Appellant.

*Vargas, Dillon & Bartlett,* of Reno, for Respondent City of Reno.

*Woodburn, Forman and Woodburn* and *Gordon R. Thompson,* of Reno, for Respondents Lerner Shops and Lynch.

# OPINION

By the Court, BADT, J.:

Appellant, Adele Olga Rickard, plaintiff below, sued the City of Reno and the other respondents for damages for personal injuries resulting from a fall on the sidewalk in the City of Reno. At the close of plaintiff's case the defendant city moved for a dismissal on the ground that plaintiff had failed to prove a sufficient case for the court or jury. Rule 41(b) N.R.C.P. The court granted the motion and dismissed the jury, holding that plaintiff was contributorily negligent as a matter of law. Appellant contends that the minds of reasonable men could well differ as to her contributory negligence and that it was error to take from the jury the determination of such issue of fact. Respondents, relying upon the rule that if the judgment was correct on any ground, it should be affirmed even if the ground stated by the court is insufficient (Richards v. Vermilyea, 42 Nev. 294, 175 P. 188, 180 P. 121), contend (1) that plaintiff failed to show any negligence in the defendants; (2) that any defect in the sidewalk, shown by the evidence, was such a minor defect as to be trivial; (3) that the defendant was contributorily negligent as a matter of law; and (4) that even assuming defendants' negligence in the maintenance of the sidewalk and lack of contributory negligence on the part of the plaintiff, there is an entire lack of showing that plaintiff's fall was caused by the condition of the sidewalk. All of these contentions were briefed and orally argued at great length by the respective parties. Our conclusion that there was an entire lack of proof that the condition of the sidewalk caused the plaintiff's fall makes it unnecessary for us to consider the other contentions, interesting and important as they are. Under the facts surrounding the plaintiff's fall and the lack of proof as to what caused it, we simply do not reach the other phases of the case.

The plaintiff, a woman of the age of sixty-four years, enjoying good health and good vision, was walking northward on the west side of Virginia Street, a busy street in the business district of Reno, on the east side of the sidewalk. She was walking at a moderate pace and wearing common-sense walking shoes. The sidewalk was thirteen feet ten inches from the building line to the curb and she was walking approximately four feet in from the curb. The time was about 10: 30 in the morning, the day was clear, the temperature mild. People were approaching her from the north, but no one was directly in front of her as she proceeded northward. She fell at a point where there was upon the sidewalk what is referred to throughout the testimony as "a depression" or "a slight depression." She and her witnesses had passed over the spot many times before. There is no indication that any other person had ever fallen there. Her theory is that her fall was caused by her stepping into this depression, combined with the circumstance that a recent street flushing operation resulted in a deposit of material within the depression, both of which circumstances, or either of them, resulting from the defendants' negligence, caused her to fall. Before analyzing the proof or lack of proof as to what caused the plaintiff's fall, it becomes necessary to describe the condition of the sidewalk.

As to this there is virtually no conflict in the testimony of the witnesses. The depression was generally circular in form, possibly four or five to six feet in diameter. From the watermarks or water stains on the cement plaintiff thought it was about six feet in diameter and sloping to a maximum depth of one inch approximately in the center. Although in answer to a question as to whether the depression was abrupt or gradual, she answered, "Well, it is really abrupt," her further description and the description given by her witnesses indicate rather conclusively that the slope from the perimeter to the one inch depth in the center was a gradual

one. When describing the point just within the circumference of the depression where plaintiff put her foot when she fell, with reference to the extent of the slope or difference in elevation, plaintiff's witness Gulling was asked: "Well, do you think it was a quarter of an inch lower, or half an inch, or what?" He replied, "No, I wouldn't say it was a quarter of an inch, no * * * might be less than that." Thus the incline was one inch in three feet. A yardstick raised one inch at one end, indicates the slope. There was also a gradual slope of the sidewalk from the property line to the curb. There remained three or four feet of level sidewalk between the westerly extremity of the depression and the property line. Where the easterly limit of the depression approached the curb, the curb had been lowered till it was almost flush with the sidewalk. A few feet to the north and south of this point, however, the curb was four or five inches high. Earlier street flushing operations that day had resulted in flushing the water from the gutter into the depression. As to the deposit left by the flushing operation, plaintiff testified: "I saw a depression and I saw moisture. * * * I saw a dirty looking sidewalk. It's difficult to explain. It just didn't look clean, but it didn't look dangerous, either. * * * I noticed water—where water had been. However, there wasn't any water there at the time. The drainage was good. The sidewalk was dirty, this portion of it, silt, black slime or dark." On cross examination when her attention was called to her description of "black slime or dark," she replied: "Just a dirty looking sidewalk there, nothing that looked dangerous. I noticed a little bit of it as I approached." On redirect in answer to the question, "How did you know the sidewalk was dirty?", she replied, "When I got up from the fall I had a black substance on my coat and I also had something on the inside of my right shoe." When asked, "Did you see any grease or silt right there when you fell?", she replied, "I wouldn't know what was on there

any more than it looked like, as I say, I took and flirt a mop. It has that damp look. Not wet, runny wet, but just moist, but nothing to fear"; that sand or dirt on the sidewalk was not of any great degree; that "if there was anything there it was adhering so closely" it did not look dangerous. Plaintiff's witness Gulling said: "The circumference of this depression looked scummy and greasy. * * * like the greasy ring in a bathtub." Her witness Sinelio noticed "a very slight dampness." Her witness Browne "thought it was more black and slimy. I'd say it was muddy, black mud."

We turn then to a consideration of what happened as plaintiff approached this depression and fell. The plaintiff herself, one witness who was walking behind her and one witness who was approaching her from the north are the only three persons who testified as to what happened. Plaintiff testified: "I fell forward. * * * My feet went out from under me and I fell flat on my nose. I had a sensation of shock." On cross examination she affirmed the testimony given in her deposition taken by defendant, when she was asked: "Q. Well, do you know what happened? A. No, sir, it just happened like that. I was on my feet and just walking along at a conservative pace, and suddenly I was—I hit the sidewalk. * * * I have noticed, of course, that the sidewalk was sloped there, but then you are accustomed to walking on sidewalks that have a slope, so it wouldn't impress me as being anything out of the ordinary."

Plaintiff's witness Gulling, who was walking directly behind the plaintiff, was asked to tell the court and jury what he saw: "The first thing I saw was Mrs. Rickard go down. * * * Saw Mrs. Rickard fall. * * * She fell in the direction she was going. * * * She fell quickly. * * * I wouldn't say that I saw either of Mrs. Rickard's feet actually slip." Plaintiff's witness Sinelio was walking south toward the plaintiff as the latter was walking north, and stated: "Well, this lady was approaching me, and all of the sudden she fell to

the sidewalk. \* \* \* I don't know just how she fell. Her feet seemed to have gone out from under her."

We therefore have the testimony that plaintiff fell. She fell at a point about at the beginning of the slope into the slight depression. She fell forward, and the theory is presented upon this appeal that her foot or feet slipped backward. No testimony, demonstration or observation was to the effect that any part of the slight incline into the depression was actually slippery. The richness of the English language is evidenced not only by the descriptive words used by plaintiff and her several witnesses but by their expressive similes—moisture, dirty looking, like silt, black slime or dark, like that resulting from flirting a mop, not runny wet but damp, scummy and greasy, like the greasy ring in a bathtub, more black and slimy, muddy, black mud. These witnesses were all intellectually equipped to determine and to testify that the sidewalk was slippery. None of them did so. Nor did plaintiff or any of her witnesses explain how the slight slope downward—one inch to three feet— covered by this residue left by the receding water, caused her feet to slip backward so that she fell forward.

In answer to the contention of respondents that it would have been impossible from the testimony to determine what caused her to fall, or, more precisely, that the sidewalk defect, if one existed, was the proximate cause of her fall, plaintiff relies upon the rule that not only must the testimony be read in the light most advantageous to her and all conflicts resolved in her favor, but that she be also given the benefit of all inferences which the jury might reasonably have drawn from the proved facts.

Section 9047.02, N.C.L.1931–1941 Supp., reads: "An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." Assuming then an unsafe sidewalk condition and plaintiff's forward fall at the

place of such unsafe condition as proved facts, it is appellant's contention that the jury would have the right to draw the inference that such unsafe condition was the proximate cause of her fall.

In City of Paducah v. McManus, 256 Ky. 405, 76 S.W. 2d 254, 256, the court said: "In City of Dayton v. Fox, 254 Ky. 51, 70 S.W.2d 961, 963, we said: 'A dangerous or unsafe condition will not be presumed from the accident alone and the mere fact that a pedestrian slipped and fell upon the sidewalk is insufficient to warrant a recovery, unless it is shown that the condition of the walk at the place was necessarily dangerous or unsafe for pedestrians when in the exercise of ordinary care for their own safety, *and that the unsafe condition was the proximate cause of the injury.*'" (Italics by the court.) The same language was quoted in City of Louisville v. Moore, 267 Ky. 536, 102 S.W.2d 989, and is undoubtedly a correct statement of the law. In both of the cases cited the facts presented a stronger case for an inference than here.

This court has likewise pronounced the rule that in actions of this kind plaintiff must show not only a duty owing from the defendant to the plaintiff, a breach of that duty, and that plaintiff was injured and damaged, but also that defendant's negligence or breach of duty was the proximate cause of the injury or damage. City of Las Vegas v. Schultz, 59 Nev. 1, 83 P.2d 1040.

It is undoubtedly true that an inference of proximate cause may be drawn from the proved facts. Here there is no proof that plaintiff's feet slipped, nor indeed that the sidewalk was slippery at the point where she fell. And if an inference could possibly be drawn from the testimony that the point where plaintiff fell was actually slippery,[1] the jury would then have had to draw the

---

[1] But note the possibility of the contrary inference—that the deposit had a retarding or "non-skid effect."

further inference (based not upon a proved fact but upon the foregoing inference) that upon the forward sloping pavement her feet slipped, not forward but backward. We do not think that such an inference, contrary to the normal experiences of men, to say nothing of the laws of physics, could have reasonably been drawn. Other inferences might also have been indulged as to the possible cause of the fall—a sudden giving way of the knees, one foot striking the other, anything that might have caused one or both feet suddenly to stop, with the natural and normal result of a pitching forward of the body. From any viewpoint we are of the opinion that, from the facts proved, the jury could not have drawn a reasonable inference that the defect relied upon was the proximate cause of appellant's fall. We are therefore of the opinion that there was no error in taking the case from the jury.

Defendants, Lerner and Lynch, as alleged owners, lessees or occupants of the premises abutting the sidewalk in question, have presented additional argument and authority in support of sustaining the judgment as to them. Under the conclusion reached above, it becomes unnecessary for us to consider such contentions.

The judgment is affirmed with costs.

MERRILL, C. J., and EATHER, J., concur.